Filed 1/27/15  In re J.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re J.H. et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061630 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J241843 & J241844) |
| v. | OPINION |
| E.D. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant E.D.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant S.K.

Jean-Rene Basle, County Counsel, Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated the parental rights of E.D. (father) and S.K. (mother) (collectively parents) to children J.H. (born March 2010) and O.H. (born January 2009) (collectively children) and found the children adoptable. On appeal, father contends insufficient evidence supports the juvenile court's determination that the beneficial parent relationship exception to termination of parental rights did not apply. Mother declined to file her own brief on appeal, but joins in and adopts father's arguments to the extent they inure to her benefit. We affirm.

FACTUAL AND PROCEDURAL HISTORY[1]

On November 21, 2011, while on probation for convictions for child cruelty and possession of a controlled substance, mother was arrested at her home with two other individuals for drug use. Children were left in the care of father. The arresting deputy noted the home was filthy. There was exposed wiring in the home and drug paraphernalia in children's room. The deputy informed father the deputy would be back in a week to see if the home had been cleaned. When the deputy returned on November 28, 2011, he arrested father for child cruelty, possession of controlled substances, and maintaining a place for the use or sale of controlled substances; the home had not been cleaned and another individual under the influence of methamphetamine was arrested at the home. Father reported he "[had] been smoking meth since Thanksgiving Day."

---

[1] By order dated August 20, 2014, we incorporated the record in case No. E060562, mother's petition for extraordinary writ from the order terminating her reunification services, into the record in this case. We take the bulk of our recitation of the factual and procedural history from the opinion we issued in that case, denying the petition on May 9, 2014.

The reporting party noted law enforcement had been to the home between 15 and 20 times in the past six months regarding reported drug trafficking. Father had a previous criminal history, which included controlled substance violations and domestic violence. Mother had a criminal history including over a dozen arrests, some for controlled substance violations. Parents had numerous prior unsubstantiated San Bernardino County Department of Children and Family Services (CFS) referrals for emotional abuse, caretaker incapacity, and general neglect beginning in April 2009. A prior case had been opened in March 2010, when J.H. was born testing positive for methamphetamine. Both children had been removed from parents' custody, but were returned on May 26, 2011, when the family stabilized and the case was dismissed.

In the instant case, children were detained and later placed on December 14, 2011, in the custody of the prospective adoptive parents (PAPs) with whom children had been placed in the previous dependency proceeding.[2] The juvenile court granted parents joint visitation of one hour, twice weekly upon parents' release from custody.

In a jurisdictional and dispositional report filed December 19, 2011, the social worker noted father has engaged in domestic disputes with mother in the presence of children. Father appeared to be continuing his use of methamphetamine. Mother made statements that she felt children would be better off without her and that she wished to relinquish them to the PAPs. Mother admitted she "'has done drugs all her life.'" CFS arranged weekly, hourly visitation between father and children. Father had his first visit

---

[2] J.H. spent the first 10 months of his life in the PAPs' care during the previous proceedings. O.H. had spent eight months in their care during the previous proceedings.

3

on December 14, 2011. The visit appeared appropriate, with father playing and exchanging physical affection with children. Mother had not yet visited due to her incarceration.

Father admitted mother hits him. Mother was incarcerated and not expected to be released until March 4, 2012. Mother was eventually released from custody on January 20, 2012, and given instant referrals to Inland Valley Recovery Services (IVRS) (substance abuse counseling), bilingual counseling, and random drug testing. The juvenile court formally removed children from parents' custody on January 23, 2012, granting joint visitation of two hours twice a week.

In a status review report filed July 16, 2012, the social worker recommended services be continued for father, but terminated for mother. On January 23, 2012, mother requested a change of location referral for IVRS from Upland to San Bernardino; CFS complied. On February 2, 2012, mother requested another change of location referral for IVRS; CFS issued a new referral on February 8, 2012. Mother had eight visits with children. J.H. was reportedly resistant to affection from mother, but mother would force him to kiss and hug her.

A status review report dated July 16, 2012, reflected mother had slapped J.H. on the hand for misbehaving during a visit on January 27, 2012. Mother believed she should be able to punish children in any manner in which she saw fit. On February 19, 2012, mother was again arrested for possession of a controlled substance and a parole violation. Mother reported police had planted the methamphetamine in her bag. Mother was released from jail on June 12, 2012, and admitted to a 90-day New House Residential

4

substance treatment program.

Father had eight random drug tests as of March 12, 2012, all of which were negative. He attended 30 NA meetings as of January 15, 2012, on a weekly basis. Father completed parenting classes on April 17, 2012. He completed the individual counseling requirements of his plan, but continued to attend counseling. Father "regularly attends his visitations; he is always on time[] and stays for the duration of the visit. [Father] has participated in his services on a regular basis and has demonstrated that he is benefiting from services. [Father] has demonstrated that he [h]as completed the case plan objectives satisfactorily."

In fact, father had attended all visitation permitted and the visits were deemed "appropriate and beneficial" to children. Father said he was no longer in a relationship with mother and intended to stay away from her once she was released. The social worker opined father made significant progress on his case plan and recommended he receive six more months of services.

An addendum report filed August 16, 2012, reflects mother tested positive for methamphetamine on July 15, 2012, and failed to show for a random drug test on July 16, 2012. Mother had been visiting with children four hours weekly.

Father completed an outpatient substance abuse program; however, he denied "having a substance abuse problem and minimize[ed] his need for treatment." Father explained that his initial positive drug test for methamphetamine was due to his having taken Sudafed. He said he lied when he told police he had smoked methamphetamine. Father continued to attend AA/NA meetings and was working on the 12-step program,

5

but "has not benefited from the mentioned programs." He said he was on step four, but had difficulty explaining what that step entailed and could not explain steps two and three.

On August 20, 2012, the juvenile court found mother had failed to participate regularly and make any progress in her case plan, there was no probability of return of children to mother, and the court ordered mother's reunification services terminated. The court ordered one-hour weekly visits for mother. The court found father's progress was moderate and ordered twice weekly visitation of 90 minutes.

In a status review report filed January 16, 2013, the social worker recommended father continue to receive reunification services. Mother apparently had 90-minute weekly visits with children. It was noted children disliked mother's expressions of physical affection. The juvenile court continued father's reunification services.

"[F]ather attends individual therapy, drug test[s], attends AA/NA meetings[,] and visits the children regularly." Father visited children three hours weekly, during which he would bring them toys and snacks. CFS "is concerned that the father appears not to have a bond with the youngest child, [J.H.] and he has to be reminded to interact with him. Also the father does not notice when the child, [J.H.,] wanders off."

Both children "display anxiety about attending the visits and on some days the children state they do not want to attend. . . . [J.H.] usually wants to leave when the foster mother leaves and he has to be talked into staying." When asked about their family, children speak of the PAPs. They are bonded and feel safe with the PAPs. Father "has not completed the court ordered treatment plan and reunification services as ordered

6

need to be continue[d] in order to resolve the problems that led to the initial removal." "It seems that the father's parenting style is passive with minimal involvement. However[,] this parenting style is not conducive to parenting young children and children that have experience[d] neglect." On January 23, 2013, the juvenile court continued father's reunification services.

On March 12, 2013, mother filed a section 388 petition requesting reinstatement of reunification services and liberalization of visitation. Mother had completed 150 days in the New House Residential Treatment Program on November 7, 2012. She had completed IVRS's Alcohol and Drug Outpatient Program on February 5, 2013. Mother tested negative for all illicit substances five times between November 7, 2012, and January 22, 2013. She had attended ten 12-step meetings between January 30, 2013, and February 5, 2013. Mother had been living in Stay Free Ministry's Sober Living Program since November 7, 2012.

In CFS's response filed April 5, 2013, the social worker recommend mother's reunification services be reinstated. A letter from J.H.'s therapist on April 9, 2013, reflected that his visits with mother had caused a regression in his behavior and triggered his posttraumatic stress disorder (PTSD). On April 10, 2013, the juvenile court granted mother's petition, reinstated her reunification services, and granted her two hours of weekly visitation with children.

On April 25, 2013, the juvenile court granted CFS's request that father have three overnight visits a week. Mother was not to attend the visits. In a status review report filed May 17, 2013, the social worker recommended children be returned to father's

7

custody with family maintenance services. J.H. had a difficult time transitioning from unsupervised visits to overnight visits. However, O.H. stated she has a good time visiting with Father. The PAPs reported O.H. became upset when she has to leave Father's house.

The social worker recommended mother continue to receive reunification services. Mother had been referred to individual and couple's therapy. Mother provided a letter dated April 9, 2013, indicating she had been participating in therapy sessions at New House with IVRS; however, the letter failed to indicate in how many sessions she had participated. O.H. reported that mother had attended their unsupervised visits with father.

At the scheduled section 366.22 hearing on May 28, 2013, children contested CFS's recommendation. The juvenile court discontinued overnight visits with father and ordered four-hour weekly unsupervised visits with father at CFS's offices. Documentation provided on July 17, 2013, reflected parents attended six sessions of couple's therapy beginning on May 29, 2013. Mother drug tested negatively three times between June 12, 2013, and July 12, 2013.

The contested section 366.22 hearing began over the course of three days on July 19, 22, and 23, 2013. Father testified he was still on probation, that mother had not lived in his home since February 2013, that mother was not in the home during his unsupervised visits, and he had attended couples' counseling every Wednesday since May 29, 2013, with mother, missing only one appointment. O.H. cries when she has to leave his home and says she would like to live with father. Children refer to the PAPs as "Auntie and Uncle."

8

Father testified the last time mother stayed overnight in his home was in January 2013; she had not visited the home since May 2013. When confronted with a picture of mother at father's house two days earlier, father admitted he had lied.

Mother testified she had spent three nights at father's house during the past weekend, she had a 20-year drug history, and she had now been sober for the longest period in her life, just over a year. She admitted that at the time children were most recently taken from her home, she had been selling drugs out of the home. Mother attended AA meetings five days a week and had previously participated in individual counseling, but no longer did so. Mother admitted committing domestic violence against father in front of J.H. Mother had been participating in domestic violence counseling.

The social worker testified she had been assigned to the case on May 21, 2012. O.H. had reported to her that mother was in father's home during father's unsupervised visits, including the overnight visits during which mother slept on the floor. The paternal grandmother shared, with the social worker, a video of mother in the home during a visit in November 2012; parents would argue. Parents had made no progress on the domestic violence issues.

J.H. was anxious around mother, did not want to visit father without the PAPs present, and would sometimes react violently to visitation. During overnight visitation J.H would cry all night for the PAPs. J.H. identified the PAPs as his family. Nonetheless, the social worker opined "I think that [father] is learning how to engage [J.H.] more during the visits so he doesn't tantrum or be upset because the foster mother is gone."

9

O.H. was uncomfortable with physical contact from mother. O.H. had a bond with father, but was equally bonded to the prospective adoptive mother (PAM): "It appears to be a different type of bond. She looks to [PAM] for comfort, for answers to questions. She identifies with [PAM], but she clearly enjoys visiting her dad, playing with her dad, but when you talk about family, she talks about [PAM's] family before she talks about [parents], they are included, but it's more of an afterthought." O.H. had said on occasion she wanted to live with father. She enjoyed visiting with father, but did not get upset at the end of visits.

Mother's last positive drug test was in July 2012. Mother had weekly visitation with children during the past year, missing between five to 10 visits for which she had called in sick in advance. Mother was not currently in individual counseling. Mother had engaged in six couple's therapy sessions with father. Mother had current weekly visitation with children for an hour and a half. The social worker wanted mother to participate in individual therapy, couples' therapy, and drug testing.

The social worker recommended return of children to father with family maintenance services. She had never before made such a recommendation in a case where a parent had unsupervised visitation that was terminated and replaced by supervised visitation at CFS offices. She was not sure if father would keep mother out of the home and admitted mother could have a negative influence on father.

The juvenile court continued trial on the matter for 90 days. The court ordered supervised joint visitation with parents two hours, twice weekly. Mother was to start parent-child interaction therapy (PCIT). The court noted, "The time for the deception

10

and not being truthful is now over. You are going to be seeing these children as a couple. The opportunity that you are being given is because of the Court's belief that there is a bond with [O.H.], that the mother is staying sober for a year and that you have made some improvement, [father], to be able to get to this point. Based on what I heard by way of testimony, the distortions, the misstatements, the outright misstatements of fact would have me simply pull everything from you today, so please understand that now deception is over with."

On September 26, 2013, the juvenile court granted CFS's request that parents receive unsupervised visitation with children three times a week for four hours and three overnight visits a week. In an Addendum Report filed October 16, 2013, the social worker recommended children be returned to parents' custody with family maintenance services. The social worker noted parents had made progress in PCIT and substance abuse treatment. Mother had completed 16 sessions of aftercare. The social worker logged 37 visits between children and parents. Nonetheless, children reported they wanted to live with the PAPs; children experienced stress both before and after visits with parents.

At the continued section 366.22 hearing on October 17, 2013, the juvenile court authorized continued unsupervised, extended, and overnight visits between parents and children. The court noted mother had been reported to have struck father during one of the visits. The court continued the matter to December 16, 2013.

On November 21, 2013, children's counsel filed a section 388 petition requesting termination of unsupervised and overnight visits. Children reported parents were yelling

11

and fighting during visitation; mother had hit father on more than one occasion in front of children; J.H. reported being hit by mother; children reported father had hit their paternal grandfather. O.H. had regressed since unsupervised visitation began and was experiencing enuresis. Children's therapist noted mother "appears to have a limited emotional connection and attachment and limited physical bond" to children. CFS filed a response supporting children's petition. On November 26, 2013, the court suspended unsupervised visitation and ordered supervised visits once weekly for an hour.

In a letter dated December 12, 2013, J.H.'s therapist reported that J.H.'s PTSD was in remission prior to the juvenile court's order of unsupervised visitation. Since unsupervised visitation began, J.H. had incurred significant sleep dysregulation, hypersensitivity, high levels of anxiety, avoidance, depression, anger, and disassociation: "I am concerned that parental visitation is detrimental to his functional status and the ability for gains to be made in recovery."

In an Interim Review Report filed December 16, 2013, the social worker recommended parents' reunification services be terminated. Mother had been attending individual therapy from July 31, 2013, through November 27, 2013, but was terminated from therapy after missing five sessions. O.H. "display[ed] limited attachment and limited emotional connection with" mother. Mother "appears to have a limited emotional connection and attachment and limited physical bond" with children. "[A]t this time there appears to be minimal progress towards enhancing the bond between [O.H.] and mom as well as [J.H.] and mom."

12

Father's therapist reported "seeing more of an attachment from [J.H.] towards father but not so much towards mother." J.H.'s therapist reported J.H. was "experiencing significant disruption in his necessary child routines due to the reunification strategy." The social worker opined, "It would be and has been detrimental for these children to be under the parents' care as evidenced by the children's negative behaviors and repeated self disclosure that they do not wish to live with either parent."

On December 18, 2013, children's counsel filed a duplicate section 388 petition, which removed her personal declaration and moved to withdraw the previous petition due to mother's counsel's intent to call children's counsel as a witness. On the same date, mother filed a substitution of attorney. Mother's counsel indicated he needed time to "be brought up to speed" and to "obtain transcripts" of the trial. The juvenile court granted the motion to substitute counsel and continued the matter to January 24, 2014.[3]

A report filed January 24, 2014, reflected O.H. wanted to continue to visit with parents, but remain living with the PAPs. On the same date, mother's counsel indicated he had obtained items that he was required to give as discovery to other counsel in the case. The juvenile court granted the PAPs' application for de facto parent status, ordered discovery released to the PAPs, and continued the matter to January 29, 2014.

The continued contested section 366.22 hearing was held on January 29, 30, 31, and February 3, 2014. Mother testified she had taken a shower with O.H. a couple times

---

[3] The minute order reflects that children's counsel withdrew the filing of both section 388 petitions.

13

when O.H. asked her to.

The therapist who had provided PCIT sessions for mother and children testified J.H. displayed limited attachment and physical connection to mother; he would move away from her and ask her not to play with him.[4] Both children preferred not to have physical contact with mother.

O.H. had minimal emotional connection and limited attachment with mother. The report of mother showering with O.H. concerned the therapist because it violated boundaries set by O.H. and could trigger past trauma symptoms. O.H.'s enuresis, regression, and increased aggression was likely "an indication of insecurities, unsafeness. A big one could be a change in environment, meaning, moving from maybe a structured safe  and secure environment into a chaotic environment that may lack rules, structure, boundaries." Since unsupervised visitation ceased, O.H. had stopped wetting herself. O.H. had reported enjoying spending time with mother. However, both children had begged not to have PCIT sessions with mother. The social worker testified father had reportedly completed PCIT and had "mastered" child interaction.

The juvenile court found that reasonable services had been offered parents beyond the statutory time frame. It found there was no more time for continuing reunification services, terminated parents' reunification services, and set the section 366.26 hearing.

Mother filed a petition for extraordinary writ seeking reversal of the order terminating her reunification services. Mother contended CFS failed to provide "some

---

[4] Father participated in PCIT sessions separate from mother.

continuity of family therapy." In addition, mother maintained that "the virtual suspension of visits which occurred based upon continuing negative reports of the [PAPs] who may have had their own agenda, doom[ed] the prospect of re[un]ification for the parents." Thus, mother argued insufficient evidence supported the juvenile court's order that CFS had provided reasonable services. We disagreed and denied mother's petition.

The social worker recommended in the section 366.26 report filed May 29, 2014, that the juvenile court terminate parents' parental rights and order adoption as the permanent plan. Parents had regularly attended their weekly one-hour supervised visitation at the CFS visitation center. Mother attempted to correct children when they referred to the PAPs as mother and father, wanted J.H. to say he loved mother more than the PAM, and told children they would not be adopted. Children then reported they did not want to attend a visit.

On June 5, 2014, mother filed a section 388 seeking reinstatement of reunification services. The court denied the petition without holding an evidentiary hearing.

At the contested section 366.26 hearing on July 3, 2014, father testified he did not agree with the social worker's recommendation because he loves children and would do a good job of parenting if given a chance. He had not missed a visit with them. The visits went well; children were happy to see him and mother. J.H. is affectionate with mother. Children are closer to parents now; they call them "Daddy" and "Mommy." Father admitted children also called the PAPs "Mom" and "Dad."

Mother testified she has visited with children frequently. J.H. is physically affectionate with her. Mother has a bond with children which termination of parental

15

rights would disturb.  Mother had heard children call the PAPs "Mom" and "Dad."

The social worker testified she did not believe it would be detrimental to children to terminate parents' parental rights:  She opined the benefits of adoption outweighed maintaining their relationship with parents.  Children's' primary attachment was to the PAPs.

The juvenile court terminated parents' parental rights and found children adoptable.  The court found no evidence children would be greatly harmed by termination of parental rights.

## DISCUSSION

Father contends insufficient evidence supports the juvenile court's determination that the beneficial parental relationship exception to termination of his parental rights was not applicable.  Mother adopts and joins father's argument.  We disagree with father.

Once reunification services have been terminated and a child has been found adoptable, "adoption should be ordered unless exceptional circumstances exist."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)  Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'"  (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The parent has the burden of proving termination would be detrimental to the child.  (*In re Jasmine D.* (2000) 78 Cal.App.4th

16

1339, 1350; *In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord, *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . . [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Although father maintained regular visitation with children and appeared to have a bond with children, or at least with O.H., father failed to show termination of his parental rights would be detrimental to children. J.H. had been placed with the PAPs in the first dependency proceeding in March 2010, when he was five days old and was returned on May 6, 2011. O.H. had been placed with the PAPs in May 2010, when she was 16 months old and returned to parents' custody on May 6, 2011. Both children were

17

subsequently placed with the PAPs again on December 14, 2011, where they remained on the day parents' parental rights were terminated on July 3, 2014. At the time of termination of parents' parental rights, J.H. was a little over four years old and O.H. was about five and a half years old. Thus, children had respectively spent 45 and 43 months in the PAPs care and out of parents' custody. Therefore, children had spent the overwhelming majority of their lives out of parents' custody and in the care of the PAPs.

The social worker testified, "The children are not bonded to the parents. The parents have not benefitted from the services. Each time we go to unsupervised and even out of unsupervised visits, incidents are being reported from the children to the caretakers that shows that the parents are displaying inappropriate behavior in front of the children. [¶] I don't think that the parents are protective. I don't think Dad can protect the children from Mom's behavior." "[F]ather is very passive. He is not—he's not protective. He's not going to stop Mom from doing things that are inappropriate."

Indeed, mother had reportedly showered with both children in the presence of father despite being advised children did not like physical contact with her and being told by the therapist to engage in limited physical interaction with them. The juvenile court expressly found father did nothing to stop it and that father actually testified that he "saw nothing wrong with it." Father had been granted unsupervised visitation with children twice before. Both times that visitation was terminated.

Mother had much less visitation with children than did father due to her incarcerations in the early portion of the proceedings, missed visits, and the initial denial of reunification services for her. Throughout the proceedings it was noted children had

18

little to no bond with mother.  The juvenile court observed parents had been given every opportunity to develop a bond with children:  "And as everyone knows in this case, there's been the extra lap, plus two, done on this case with respect to trying to see how we could work out with reunification and otherwise . . . ."

The court expressly found no evidence that parents were in a parental relationship with children:  "They play with them.  They have games with them.  But outside of the structured setting, the Court has not seen the evidence that there is a parental relationship going on."  The court observed "these children need that permanence and need that stability that the [PAPs] are very much willing to offer them."  Substantial evidence supports the court's determination that termination of parents' parental rights would not be detrimental to children.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RICHLI
Acting P. J.

KING
J.

19